NOT DESIGNATED FOR PUBLICATION

No. 115,198

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of L.C., A Minor Child.

MEMORANDUM OPINION

Appeal from Kiowa District Court; VAN Z. HAMPTON, judge. Opinion filed September 30, 2016. Affirmed.

*Andrew M. Stein*, of Doll Law Firm, LLC, of Dodge City, for appellant natural father.

*J. Scott James*, county attorney, for appellee State of Kansas.

*Michael K. Johnston*, of Johnston, Eisenhauer, Eisenhauer & Lynch, LLC, of Pratt, for appellee guardian ad litem.

*Clayton I. Kerbs*, of Kerbs Law Office, of Dodge City, for appellee maternal aunt.

*Sarah Bootes Shattuck*, of The Shattuck Law Office, of Ashland, for appellee natural mother.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*: This is an appeal from the district court's order terminating the parental rights of D.C. (Father), who is the biological father of L.C., a minor child born in 2011. The district court found Father was unfit, his unfitness was unlikely to change in the foreseeable future, and termination of parental rights was in L.C.'s best interests. Father maintains the district court's findings were not supported by sufficient evidence. Finding no error, we affirm.

1

*Factual and procedural background*

Because this case questions the sufficiency of the evidence, we set forth the underlying facts in detail.

On May 29, 2015, Kiowa County law enforcement officers initiated a traffic stop of a vehicle registered to Jimmie D. Muir, a resident of Dumas, Texas. Mr. Muir was not with his vehicle; instead it was occupied by two women, including J.S. (Mother) and her daughter, L.C. Law enforcement officers discovered drug paraphernalia in the vehicle, which Mother admitted belonged to her. Mother was also driving without a valid license. She was arrested for those reasons. Upon further investigation, law enforcement officers discovered that Mother did not have Mr. Muir's permission to take his vehicle, but instead, allegedly murdered Mr. Muir at his home in Dumas, Texas, and was trying to get back to Ohio.

Mother was charged with capital murder in Moore County, Texas, in connection with the death of Mr. Muir. The charges filed by the Moore County District Attorney's Office remained pending throughout the course of the Child in Need of Care (CINC) proceedings.

On June 1, 2015, the State filed a petition alleging L.C. was a child in need of care. The petition provided that L.C. was "without adequate parental care, control or subsistence" under K.S.A. 2015 Supp. 38-2202(d)(1). The petition further stated L.C. was "without the care or control necessary for the child's physical, mental or emotional health" under K.S.A. 2015 Supp. 38-2202(d)(2). That same day, the district court also issued a notice of a temporary custody hearing to be held the following day. Father, who lived in Ohio, received notice by telephone.

Mother appeared at the temporary custody hearing. Father, though notified, did not appear. The district court found: (1) L.C. was likely to sustain harm if not immediately removed from the home; (2) remaining in the home or returning to the home would be contrary to L.C.'s welfare; (3) and immediate placement was in L.C.'s best interests because Mother had been arrested on first-degree murder charges. The district court granted temporary custody of L.C. to the maternal aunt. Mother consented to the placement. The aunt resided in Taylorville, Illinois. The day after the hearing, Father stopped in Taylorville at 8:30 p.m. and visited L.C. in person at the aunt's home.

On June 11, 2015, a child welfare specialist from the Illinois Department of Children and Family Services visited the aunt's home and performed a home study. The study provided that the home was a two-bedroom, one-level house, and included a living room and a kitchen. Additionally, there was a fenced-in yard with enough room for the children to play and the fence provided protection from the nearby railroad tracks. The home was clean and appeared reasonably free of hazards to the children. The other children residing in the home were the aunt's three biological children. L.C. slept in the girls' bedroom and had her own bed. According to the worker, L.C. was clean and dressed, and did not appear to have any signs of abuse or neglect. L.C. did not appear fearful of her aunt and sought her out when she needed something, such as a drink.

The petition/adjudication hearing was held on June 30, 2015. Although proper notice was given, Father failed to appear for this hearing. The district court found L.C. was a child in need of care. The district court further ordered that L.C. remain in her aunt's custody and continued the disposition of the matter to a later date. Following the hearing, Father submitted a letter, notifying the district court that he attempted to attend both hearings—June 2, 2015, and June 30, 2015—but he was tardy to both "due to long drives."

The dispositional hearing was held on August 28, 2015. The district court found: (1) "Father has voluntarily not appeared"; (2) reintegration with the natural parents was not a viable option; and (3) L.C. should remain in the aunt's custody. The district court also ordered Father to obtain a home study at his own expense, that visitation with L.C. be discontinued, and that the State prepare a motion to terminate parental rights. The State filed its motion on October 8, 2015.

On his way back from the dispositional hearing, Father again stopped in Taylorsville to visit L.C. This visit was also unannounced, and the aunt denied him visitation due to the court order.

The termination hearing was held on January 13, 2016. The aunt testified that L.C. attended weekly counseling and was showing progress. She also went to preschool full-time, where she was making "tremendous strides"—learning her ABCs, playing with friends, and participating in school plays. The aunt contacted the Illinois Department of Children and Family Services and arranged three or four different times for Father to visit L.C. Father failed to attend any of the visits.

The aunt further testified she had concerns regarding Father's violent behavior. She stated Mother moved to Texas to get away from Father and the abuse. She said she talked to law enforcement officers following altercations involving Father. The aunt said that "on several occasions" she had to pay for hotel rooms for her sister "because he beat her up and kicked her out."

The aunt also described the condition of Father's home. She believed the house was condemned because it was in horrible condition. She said a couch was used as a wall, it was completely cluttered, there were holes in the walls, the ceiling was falling through, and although there were no animals, there was urine and excrement on the floor. The aunt

4

admitted, however, that she had not spent a lot of time with Father, and she had not been to his home since 2011.

The aunt also voiced her concerns regarding the toxicity of the relationship between Mother and Father. She testified the relationship was abusive, it involved the use of drugs and alcohol, there was no stability, and there was controlling and manipulative behavior on both of their parts. Regarding the lack of stability, the aunt testified the longest L.C. had lived anywhere was when she lived with the aunt for the last 7 months during this case. The aunt stated L.C. had previously been kicked out of school due to the lack of attendance, she had lice for months, and Father failed to pick L.C. up from school on occasions.

Father also testified at the termination hearing. He admitted that he stayed in a motel a couple of days "here and there" in order to "keep the confusion down." He stated he and Mother argued and fought and he did not want L.C. to be around that environment. Father also testified to his criminal history. He said he served time in prison for possession of drugs and burglary. He further testified he had been convicted of other crimes in city courts including trespassing, disorderly conduct, interference with custody, and falsification. Additional testimony was provided based on a background check Father obtained. The report included convictions of felonious assault, burglary, a probation violation, a probation violation due to a new felony (which Father claimed was false), felony possession of drugs, theft, domestic violence, and a violation of a temporary protection order. Father explained the domestic violence conviction was actually a misdemeanor and it was due to throwing juice at the mother of one of his other children. He first testified the juice did not hit her, then he stated it had hit her. He also stated the temporary protection order involved that same mother. Father first testified that the last time he had been convicted of a crime was 2011 and the last time he was incarcerated was in 2004. He later testified his last conviction was in 2014, and 2011 was the last time he was incarcerated.

Father testified he had a total of four children with four different mothers. He paid $87.49 per week for three children, which did not include L.C. He said he was behind on his child support payments, but he was unable to provide an amount owed. He agreed that he had not provided support to the aunt for L.C., although he testified he offered to buy her clothes. Father also testified he knew L.C. needed therapy because she may have witnessed the murder Mother allegedly committed. Father said he had stable employment. He testified he drove box trucks and he had been employed since September 9, 2015, which was approximately 1 month prior to the motion to terminate his parental rights. He testified this was the first stable job he had held in a while; Father did not file tax returns for the years 2013 or 2014. Father testified he had a vendor's license and he was trying to start a business selling miscellaneous items, such as CDs, video games, and DVDs. He also stated he worked odd jobs to pay rent and child support.

Father testified he resided in Springfield, Ohio. He was further questioned about the home study, which he failed to provide, and the overall condition of the home. Father stated he was aware he needed to have a home study, and he said he had worked on it by picking up various documents. These documents did not include the condition of the home. Father said the home study involved more than just checking the home; it involved additional requirements, which he said he was working to complete. He said he had difficulty obtaining a home study due to his work schedule and the home study person's schedule. He testified a caseworker did visit his home, and all that remained of the home study was for him to complete the financial summary of his income and for the caseworker to complete a second walk-through. Additionally, counsel questioned Father regarding the status of his home. He testified he had been living there since 2007. He said he was aware his landlord was losing some of his properties. Father said he worked something out with the landlord and he continued to pay monthly rent. Father was unable to answer the question regarding whether his home was being foreclosed. His answer was consistently, "All I know, I was paying rent every month."

After hearing the testimony and reviewing the record, the district court found by clear and convincing evidence that Mother and Father were unfit to properly care for L.C. The district court found the conditions of unfitness on the part of Mother and Father were unlikely to change in the foreseeable future. The district court concluded it was in the best interests of L.C. to terminate Mother's and Father's parental rights. Father timely appeals.

*Jurisdiction*

Before we address the issues on appeal, we must first address whether the district court had jurisdiction to terminate Father's parental rights. None of the parties was a resident of Kansas. Kansas was not L.C.'s home state. L.C. was taken into custody in Kansas when Mother was on her way to Ohio from Texas. The district court then ordered L.C. to be placed in temporary custody with the aunt, who resided in Illinois.

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015). If the district court lacks jurisdiction to enter an order, an appellate court does not acquire jurisdiction over the subject matter on appeal. *State v. McCoin*, 278 Kan. 465, 468, 101 P.3d 1204 (2004).

"Jurisdiction and venue are creatures of statute." *In re E.T.*, No. 111,971, 2015 WL 1125364, at *4 (Kan. App. 2015) (unpublished opinion), *rev. denied* 302 Kan. 1010 (2015). The Revised Kansas Code for Care of Children, K.S.A. 38-2201 *et seq.*, provides that subject to the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), K.S.A. 2015 Supp. 23-37,101 *et seq.*, the Kansas district courts shall have original jurisdiction over proceedings under the code. See K.S.A. 2015 Supp. 38-2203(b). Under the UCCJEA, an initial child-custody jurisdiction is proper in a Kansas court under four

possible scenarios, determined in order of applicability. K.S.A. 2015 Supp. 23-37,201 provides:

"(a) Except as otherwise provided in K.S.A. 2015 Supp. 23-37,204, and amendments thereto, a court of this state has jurisdiction to make an initial child-custody determination only if:

(1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under K.S.A. 23-37,207 or 23-37,208, and amendments thereto, and:

(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under K.S.A. 23-37,207 or 23-37,208, and amendments thereto; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3).

"(b) Subsection (a) is the exclusive jurisdictional basis for making a child-custody determination by a court of this state.

"(c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child-custody determination."

Jurisdiction can also be obtained through temporary emergency orders under K.S.A. 2015 Supp. 23-37,204. All three of the jurisdictional statutes of the UCCJEA (23-37,201 through 23-37,203) are subject to emergency jurisdiction. K.S.A. 2015 Supp. 23-37,204 provides:

"(a) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

"(b) If there is no previous child-custody determination that is entitled to be enforced under this act and a child-custody proceeding has not been commenced in a court of a state having jurisdiction under K.S.A. 2015 Supp. 23-37,201 through 23-37,203, and amendments thereto, a child-custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under K.S.A. 2015 Supp. 23-37,201 through 23-37,203, and amendments thereto. If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under K.S.A. 2015 Supp. 23-37,201 through 23-37,203, and amendments thereto, a child-custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child."

Here, the record is void of any previous child-custody determinations in any other state. Therefore, it appears the district court maintained temporary emergency jurisdiction. Because the district court had jurisdiction to terminate the parental rights, this court has jurisdiction to review the district courts findings and conclusions.

*Father's challenge to the district court's finding regarding reintegration*

On appeal, Father first argues the district court erred in determining reintegration was not a viable alternative. He further contends the district court failed to make specific findings pursuant to K.S.A. 2015 Supp. 38-2255(e).

The district court held that reintegration was not a viable option on August 28, 2015. Father did not file his appeal until January 14, 2016. An order must be appealed at the time when it first ripens for appeal purposes, or the right to appeal that order is waived, even if a subsequent order may be appealed. *In re L.B.*, 42 Kan. App. 2d 837, 838, 217 P.3d 1004 (2009), *rev. denied* 289 Kan. 1278 (2010). Father's appeal is untimely as to the dispositional hearing and this court lacks jurisdiction to consider this issue on appeal. See *Albright v. State*, 292 Kan. 193, 197, 251 P.3d 52 (2011) (the timely filing of a notice of appeal ordinarily is jurisdictional).

Furthermore, even if this panel were to address the merits of this claim, Father has failed to provide this court with a transcript of the dispositional hearing. As the party making a claim, it is the Father's burden to designate facts in the record to support that claim; without such a record, the claim of error fails. *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644-45, 294 P.3d 287 (2013). Thus, this issue is not properly before this court.

*Father's challenge to decision terminating his parental rights*

For his second issue on appeal, Father argues the district court's decision to terminate his parental rights was not supported by sufficient evidence.

When reviewing the district court's decision to terminate parental rights, this court must "consider whether, after review of all the evidence, viewed in the light most

favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence," that the parent's rights should be terminated. *In re B.D.-Y*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008). In making this determination, we do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 286 Kan. at 705.

If a child is adjudicated a child in need of care, parental rights may be terminated "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2015 Supp. 38-2269(a). K.S.A 2015 Supp. 38-2269(b) and (c), lists a number of nonexclusive factors the district court must consider in determining a parent's unfitness. Any one of the factors may, but does not necessarily, establish grounds for terminating a parent's rights. See K.S.A. 2015 Supp. 38-2269(f). The district court is not limited to the statutory factors in making a determination of unfitness. See K.S.A. 2015 Supp. 38-2269(b).

Before we address the district court's findings, we note Father argues the district court misapplied various factors. Really, Father is asking this court to reweigh the evidence. An appellate court does not reweigh evidence or pass on the credibility of the witnesses. *In re B.D.-Y*, 286 Kan. at 705. Father does contend, however, that the district court misapplied the factor relating to conviction and imprisonment. He claims that because he was not presently incarcerated, nor had he been incarcerated at any time during L.C.'s life, it was error for the district court to consider this factor. This is a matter of statutory interpretation, which is a question of law subject to unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind

11

that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016).

K.S.A. 2015 Supp. 38-2269(b) provides: "In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable: . . . . (5) conviction of a felony and imprisonment."

This statute does not provide that the district court can consider a felony conviction only if the parent is currently incarcerated. To find that the legislature intended this meaning would necessarily require this court to read something into the statute that is not readily found in its words. *Schmidt*, 303 Kan. at 659. Moreover, the statute provides the district court may consider the list of factors provided, but it is not limited to those factors. Here, the district court did not err by considering Father's criminal history and past incarceration as one of seven factors used to determine Father's unfitness.

The district court found Father unfit based on the following statutory factors:

- Father had a criminal history that included a felony conviction of burglary, which resulted in 17 months' imprisonment, satisfying K.S.A. 2015 Supp. 38-2269(b)(5).
- Reasonable efforts by appropriate public or private agencies had been unable to rehabilitate the family, satisfying K.S.A. 2015 Supp. 38-2269(b)(7). Specifically, the Illinois Department of Children and Families arranged visits on neutral sites on three separate occasions, and Father failed to attend. Additionally, Father made no serious effort to provide a home for L.C., including his failure to provide a home study as requested by the court.
- Father demonstrated a lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of L.C., satisfying K.S.A. 2015 Supp. 38-2269(b)(8).

12

Although he was provided notice, Father failed to attend hearings on three separate occasions. He also failed to cooperate in the visitation process. Furthermore, the only adjustment the district court heard was Father's recent employment.

- Father failed to assure care of L.C. coming back into the home, satisfying K.S.A. 2015 Supp. 38-2269(c)(1). The district court found Father made no meaningful effort to provide either a home study or show actions that he would enlist the help of family or others to assist in L.C.'s reintegration.

- Father failed to maintain regular visitation, communication, or contact with L.C., satisfying K.S.A. 2015 Supp. 38-2269(c)(2).

- Father failed to carry out a reasonable plan approved by the district court directed toward the integration of L.C. into Father's home, satisfying K.S.A. 2015 Supp. 38-2269(c)(3).

- Father showed a lack of effort to adjust his circumstances, conduct, or conditions to meet the needs of L.C., satisfying K.S.A. 2015 Supp. 38-2269(b)(8). The district court found that one adjustment "would be to find some way to provide monetary support and there was none." The district court further noted that Father failed to appear and assert his arguments or facts that would persuade the district court he was an interested party until the termination hearing.

We first examine whether the district court's findings of unfitness were supported by clear and convincing evidence. The district court heard evidence regarding the following: the toxic relationship between Mother and Father, which often included violence; Father's criminal history; Father's failure to attend hearings; and Father's failure to visit L.C. Father also failed to provide a home study as required. The district court found it troubling that Father never refuted the aunt's description of his home, which included a dilapidated structure with urine and feces on the floor. The district court also heard testimony that Father did not have a relationship with his father and his mother, who lived a distance away, therefore, Father had no family to help. Additionally, the

13

district court noted that when Father was questioned about his background, he was "incredibly evasive" and it was "difficult for [the district court] to gather any certainty about [his] circumstances." Based on these facts, we find clear and convincing evidence supporting the district court's determination that Father is unfit to properly care for L.C.

We next determine whether clear and convincing evidence supported the district court's determination that Father's behavior was unlikely to change in the foreseeable future. See K.S.A. 2015 Supp. 38-2269(a). We measure "foreseeable future" from the child's perspective and take into account a child's perception of time. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). We have considered periods of time as short as 7 months to be the foreseeable future from a child's perspective. 41 Kan. App. 2d at 790. A court may predict a parent's future unfitness based on his or her past history. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

The district court issued Father clear orders, such as obtaining a home study and participating in visitation, but he failed to comply with any of the tasks. The district court found Mother took L.C. to Texas to avoid conflict and violence. Father had no contact with L.C. while Mother was in Texas. Additionally, the district court found that from the beginning of this case, Father had made minimal efforts to assert his parental rights. He showed up to the hearings after they had been adjourned, which the district court found indicated "a lack of responsibility." The district court found:

> "But ultimately, what I got a picture of was the person who, regarding children, is irresponsible. You have three other children with three other mothers, and one of those mothers you've had a violent relationship with that resulted in a protective order and ultimately in criminal charges. So it paints a picture of a history of a home that is unfit for a child to live in."

We find clear and convincing evidence supporting the district court's determination that Father's behavior is unlikely to change in the foreseeable future.

14

Lastly, we consider whether the district court correctly found that terminating Father's parental rights was in L.C.'s best interests. See K.S.A. 2015 Supp. 38-2269(g)(1).

Because it hears the evidence directly, the district court is in the best position to determine the best interests of the child, and an appellate court cannot overturn it without finding an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 322, 235 P.3d 1255, *rev. denied* October 7, 2010. An abuse of discretion occurs when the district court acts in an unreasonable, fanciful, or arbitrary manner, or when the court bases its decision on an error of fact or an error of law. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013).

The district court found Father was not likely to change his conduct or condition in the future. Father failed to assert arguments or facts that would persuade the district court that he was an interested parent. He attempted to visit L.C. only on two occasions, both when driving back to Ohio from Kansas. Father failed to provide any support to the aunt for L.C., including monetary support for therapy. Finally, Father failed to provide information regarding the condition of his home—regarding its suitability for children or its foreclosure status. The district court found it was in the best interests of L.C. to terminate Father's parental rights. We find no abuse of discretion in that ruling.

Affirmed.

15